COMMONWEALTH *vs.* RODOLPHE G. BESSETTE & others
(No. 2 of 1966).

Barnstable. April 4, 1966. — June 15, 1966.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, & SPIEGEL, JJ.

*Conspiracy. Public Works. Contract,* For public works, With Commonwealth. *Words,* "Unlawful."

Where neither the object of a conspiracy nor the means used to accomplish the object involve criminality, the conspiracy is not criminal unless there is a substantial injurious effect upon the public, the public interest, or some individual. [162]

No crime was charged by an indictment alleging merely that the defendants conspired to cause approval of an order for payment for extra work under a contract for public work with the Commonwealth without prior filing with the Comptroller of a notice of intention to act upon

---

· the order, although the extra work was in excess of $1,000 and was not necessitated by any extreme emergency, and in effect that the purpose of the conspiracy was a violation of G. L. c. 29, § 20A.   [162–163]

INDICTMENT found and returned in the Superior Court on April 10, 1964.

Motions to quash the indictment were heard and denied by *Coddaire, J.*

*Allan M. Hale* for Charles E. Frazier, Jr.

*George L. Rabb* for Rodolphe G. Bessette.

*Manuel Katz* for Harold T. Teti.

*Francis W. Keating,* Assistant District Attorney, for the Commonwealth.

CUTTER, J.   The defendants Bessette, Frazier, and Teti were charged by indictment,[1] returned April 10, 1964, with conspiracy to cause the commissioners of the State Department of Public Works (the department) to approve an order for payment for extra work under a dredging contract without compliance with G. L. c. 29, § 20A, inserted by St. 1937, c. 407.[2]   Motions to quash were filed, asserting

---

[1] The indictment reads, in part, "Rodolphe G. Bessette, Charles E. Frazier, the younger of that name, and Harold T. Teti, on or about . . . [June 12, 1959] and . . . between that day and the date of the presenting of this indictment, at Wellfleet . . . did conspire together to have and cause the Commission of The Department of Public Works . . . [to] approve . . . a certain order for payment for extra work in addition to an existing contract of public work, without filing prior to such approval, a notice of intention to act upon such order with the Comptroller of the Commonwealth . . . the said order involving a cost in excess of one thousand dollars and . . . not being necessitated by an extreme emergency involving the health and safety of persons or damage to property or to work in progress, the said . . . Bessette being . . . Director of the Division of Waterways, Department of Public Works of the Commonwealth . . . and said . . . Frazier, being . . . an Assistant Attorney General [of Massachusetts]."   The Commonwealth later filed a bill of particulars specifying the dates of the alleged conspiracy (June 12, August 6, 13, 17 and September 1, 1959, at Wellfleet and Boston) and the means as by "false statements, false reports, and by direct actions," and referring to an order for extra work on contract No. 1973 dated August 24, 1959.

[2] Section 20A reads, in part, "No order for, or claim for payment for, extra work . . . in addition to an existing contract for the construction or repair . . . of public works of any nature whatsoever . . . shall be approved by any official . . . or commission on behalf of the commonwealth until one week after notice of intention to act upon such order or claim shall have been filed by him or it with the comptroller; provided, that, in the case of any such order estimated to . . . [cost less than $1,000] and in the case of any such order necessitated by extreme emergency involving the health or safety of persons or damage to property or to work in progress, notice of the approval of such order may be filed after the work has been . . . completed, but such

that the indictment did "not state the substantive facts as to any criminal offense," and that it was "invalid . . . for want of any allegation of prejudice to the general public or of oppression of any individual." The motions were denied subject to each defendant's exception. A motion by each defendant to direct a verdict for him was denied subject to his exception. Each defendant was found guilty. The trial was conducted under G. L. c. 278, §§ 33A–33G.[3] Each defendant appealed, and filed assignments of error. Each defendant has also filed a bill of exceptions in respect of the denial of his motion to quash the indictment. .

As background for the discussion of the indictment we summarize certain facts which could have been found from the evidence. Bessette was director of the Division of Waterways (the division) in the department from 1950 to 1962. On October 14, 1958, the commissioners gave authority to advertise a proposed dredging project in Wellfleet harbor. New England Dredge & Dock Company (NEDD) was low bidder on part of the project and was awarded a dredging contract, contract No. 1973. This contract, executed December 30, 1958, provided that certain dredging should be done to obtain a channel and basin with a depth of seven feet below mean low water. The unit price was $1.03 per cubic yard.

About June 7, 1959, dredging had been completed. Teti, NEDD's president, called Bessette to notify him that work was completed and to inform him about "shoaling," i.e. trouble caused by other material running in after the dredging and reducing the depth of the dredged area. Bessette

notice shall be so filed as soon as practicable, with a brief statement as to the character of the extreme emergency, if any, and in any event such notice shall be filed before final payment . . . on the contract . . . . The foregoing requirements shall not apply to change in quantities of work or materials covered at unit prices by an item . . . in any such original contract, nor to work other than extra work, for which payment is specifically provided . . . ." Then follows a provision governing the contents of the notice to be filed and a provision that no order shall be split in order to evade § 20A.

[3] This indictment (fn. 1) was tried with indictments charging Teti and the New England Dredge & Dock Company (NEDD) with larceny, charging Bessette and Frazier with being accessories before the fact to larceny, and charging Bessette, Frazier, and Teti with conspiracy to steal. Verdicts of not guilty were directed on the larceny and accessory indictments. The jury failed to agree upon a verdict on the conspiracy to steal indictment and a mistrial was declared.

told Teti to do some further dredging to prevent the shoal-
ing. This work was an item later included in extra work
order No. 2.[4] Teti by letter to Bessette dated June 9,
1959, confirmed the telephone instructions given to him by
Bessette.

On June 12, 1959, Bessette and Frazier, who was a select-
man of Wellfleet as well as Assistant Attorney General
dealing with waterways matters, went to the dredging site.
They staked out an area where dredging was to be done to
increase the size of an inner basin. One Sheehan, a depart-
ment engineer, told them this area was too large to be done
under an extra work order. The area then was reduced by
Sheehan from 16,000 cubic yards to 9,000 cubic yards. This
work also was included in extra work order No. 2.

The work was finished on June 16. The dredge departed
in July. Shortly thereafter Teti called Bessette to ask
when he would be paid for work later included in extra work
order No. 2. Bessette thereafter sent a memorandum to
the department's commissioners describing the extra dredg-
ing theretofore ordered: (a) about 9,700 cubic yards at
$1.03 per cubic yard, for increasing the size of the in-
ner basin (roughly the area designated by Sheehan), and
(b) the dredging done to prevent shoaling (about 16,000
cubic yards also at a unit price of $1.03). Bessette recom-
mended approval of the order and the commissioners on
August 17, 1959, authorized Bessette to give notice of the
department's intention to execute an extra work order and
to extend the contract completion date to August 31, 1959.
The department, on August 17, filed with the comptroller a
notice of intention to act upon the extra work order.[5] On
August 24, 1959, extra work order No. 2 was issued.

On August 28, the deputy comptroller asked why the
work order was issued after the last prior extension date
(June 15, 1959). Bessette, on September 1, 1959, sent a

---

[4] Extra work order No. 1 is not here involved, although the necessity of that
order was in controversy in connection with other indictments tried at the
same time.

[5] The notice was worded as if the extra work were to be done in the future.
There was evidence that this was common practice, even where an order in
fact was issued after the work had been completed.

letter to the comptroller explaining (1) the extended contract completion date, and (2) the extra work and the reasons for it.[6]  On the basis of this letter, payment (less a retained percentage) was approved, and was made to NEDD on September 24, 1959.  Final payment was made November 5, 1959.

1.  The indictment alleged (see fn. 1) simply a conspiracy "to have . . . the Commission . . . approve . . . a[n] . . . order for payment for extra work . . . without filing [with the Comptroller] prior to such approval, a notice of intention to act upon such order" which involved more than $1,000 and was "not . . . necessitated by an extreme emergency."[7]  Although not phrased precisely in the language of G. L. c. 29, § 20A, the indictment was obviously drawn with that section in mind.

In considering the sufficiency of this indictment, it must be remembered that it is of limited scope and does not charge the offences outlined in the other indictments (fn. 3) with which it was tried.  It makes no charge that the work covered by extra work order No. 2 was unnecessary, or was done inadequately, or was arranged for the purpose of defrauding the Commonwealth in any manner.

The Commonwealth in its brief does not appear to contend that the object of the alleged conspiracy would have been criminal if accomplished by an individual without any agreement with others to bring about or to participate in the planned objective.  The brief refers to no criminal statute which would have been violated if the object of the alleged conspiracy had been carried out completely.  In this case, as in *Commonwealth* v. *Bessette* (No. 1 of 1966), *ante,* p. 148 (hereinafter, for convenience, called the first 1966

---

[6] There was testimony that Frazier went to see Ronan, the deputy comptroller, who had signed the August 28 inquiry letter, with the entire file on contract No. 1973 and explained to Ronan what the work was and that it had been completed.

[7] The indictment does not in terms even allege as possible violations of § 20A, either (a) that the postponement of the formal contract completion date to August 31, 1959, was at least primarily to permit extra work order No. 2 to be placed after due notice, or (b) that the written extra work order was approved and issued after the completion of the work covered by the order.  The notice to the comptroller, of course, was in fact given about a week before extra work order No. 2 was approved by the commissioners.

*Bessette* case), the Commonwealth apparently advances the view (a) that the indictment was sufficient because it in effect alleged that the purpose of the conspiracy was to violate or avoid § 20A, and (b) that such a purpose necessarily was "unlawful" because, if successful, it would involve violation of a statute, even if such a violation has not been made a crime in itself, and despite the circumstance that no criminal or unlawful means were alleged as contemplated. See *Commonwealth* v. *Dyer,* 243 Mass. 472, 483–490.

As we have recently pointed out in the first 1966 *Bessette* case, *ante,* at pp. 152–155, the principles of criminal conspiracy have very limited application where there is no criminality shown either in the object of the alleged conspiracy or in the means by which it is to be accomplished. In cases where effort is made to apply the principles stated in the *Dyer* case, *supra,* it must appear that the accomplishment of an unlawful (but not criminal) object by noncriminal means will have serious, injurious effect, of substantial magnitude, upon the public, the public interest, or some individual. (See *Commonwealth* v. *Waterman,* 122 Mass. 43, 56–57.)

No allegations showing any such serious probable effect of the alleged conspiracy are made in this indictment. There are no averments tending to show that what was stated to be the object of the conspiracy, if carried out, would amount to more than a procedural irregularity, or that, if the statutory notice (a) was given tardily or after the work was completed, or (b) was not given at all, the consequences would be likely to be seriously detrimental to the public interest in any stated respect. Cf. *M. DeMatteo Constr. Co.* v. *Commonwealth,* 338 Mass. 568, 578–585, 587–589,[8] where, in holding that a contractor could be paid for

---

[8] In the *DeMatteo* case, as here, the extra work order was phrased as if the extra work were to be done in the future. See 338 Mass. 568, 580, fn. 1. That case appears to have been one where an oral order for extra work was reasonably given, leaving the necessary paper work to be completed later. Such a practice, of course, may well be irregular, although not criminal, and may unfairly expose a contractor, who does such extra work without a written order, to the risk of loss, if no written order is later issued, or to delay in payment.

extra work performed before the delivery of a written order, it was said, "[t]here is nothing requiring a different result in G. L. c. 29, § 20A."

This indictment is fully as inadequate as those considered in the first 1966 *Bessette* case. We are of opinion that no indictable offence has been charged. If it is desired to make violations of § 20A criminal, or to impose criminal penalties for conspiracies to violate § 20A, this should be done by adequately specific legislation. See *Commonwealth* v. *Oliver*, 342 Mass. 82, 88–89.

2. Since we conclude that this indictment was inadequate and should have been quashed, we have no occasion to consider whether the evidence was sufficient to prove any crime.

*Exceptions sustained.*